## SHALLUS *v.* UNITED STATES (No. 230).[1]

**1. TARE, GENERALLY.**

The impurities ordinarily present in an article of merchandise do not constitute tare; and such impurities as are not commonly present in the merchandise as traded in are alone, for dutiable purposes, the subject of allowance.

**2. TARE ON HIDES, SUFFICIENCY OF.**

No rule can be laid down to determine the precise number of hides in a given importation that should properly be examined and tested in order to fix a just allowance for tare on an entire consignment, but in the case at bar, of the importations immediately involved, a fair number and selection of hides were examined and tested by an examiner and by the representatives of the importer, when ten out of 795, five at a time being selected at different stages of the count, and five out of 409, chosen from the other lots, had been so examined and tested. On the evidence, an allowance of two pounds per hide for tare would have been a proper allowance on these two consignments.

United States Court of Customs Appeals, March 13, 1911.

APPEAL from decision of the Board of United States General Appraisers, Abstract 23068 (T. D. 30547).
[Modified and affirmed.]

*Walter Evans Hampton* for the appellant.
*D. Frank Lloyd,* Assistant Attorney General (*William K. Payne* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

DE VRIES, Judge, delivered the opinion of the court:

Frank H. Shallus, of Baltimore, Md., imported at that port in the latter part of 1908 and 1909, 1,001 bundles of hides weighing 58,571 pounds. The importations were made at different times by divers vessels. The hides were largely those of American cattle which had been shipped to England, there butchered, salt pickled, and returned to the United States. The protestant, who is appellant here, in due time protested against the amount of duty collected upon the hides, alleging that an insufficient allowance had been made by the collector in taring the hides for the adhering manure and salt and accumulated moisture. There was a total of 13 shipments.

There is no material conflict as to the facts. The testimony is confined in the main to two shipments. First, that by the *Quernmore,* entered March 25, 1909, covered by protest 371110; and, secondly, by the *Ulstermore,* entered April 10, 1909, covered by protest 371111.

---

1 Reported in T. D. 31408 (20 Treas. Dec., 494).

The only evidence affecting the other shipments was that of the purchasing agent of the importer who stated he had seen about 2,000 of the hides in England in 1908. Testimony was offered on behalf of the importer by the same witness that he had examined hides of the same lot imported at Philadelphia but excluded by the Board of General Appraisers. It was admitted by the importer that the hides imported at Philadelphia were not of the shipments covered by these protests; and it does not satisfactorily appear in the record that the 2,000 hides seen by the witness many months before in England were positively a part and parcel of any of these importations.

At most, the evidence offered, together with that received, as to the importations other than those covered by the two protests noted, is so entirely remote that it can not be seriously contended that it in any wise establishes or even tends to establish the condition of the merchandise, the subjects of these 13 protests. It appears from the record that of the quantities of hides imported into this country but a minor part is the subject of tare, and of those the subject of tare, the amount of tare greatly varies. These conditions reduce the serious issues in the case to the shipment by the *Quernmore* covered by protest 371110, entered March 25, 1909, and that by the *Ulstermore*, covered by protest 371111, entered April 10, 1909.

The first shipment consisted of 795 hides. On arrival at the port of Baltimore the examiner started in to weigh the whole shipment. When he had weighed a hundred or so, 5 hides were weighed and laid aside. A little later 5 more were weighed and laid aside, all for test as to tare. The examiner, from weighing and inspecting the cargo, deemed these 10 hides sufficiently representative of the 795 to properly determine the tare.

The examiner testified that after weighing each he shook both sides of them out over a truck and again weighed them. The amount of tare recovered by him from the 10 hides was about 1 pound to the hide, or 10 pounds from the 10 hides. The identical 10 hides were then turned over to the representative of the importer who applied his test, which was much more vigorous in application. He proceeded to remove the manure from the hides, the hair side first, by a spade and box scraper. After apparently recovering all that could be gleaned by the use of the spade he then applied the box scraper. Afterwards he applied a broom, and then turned the hides over and proceeded on the skin side with a spade lightly and the broom. He removed particles of salt, manure, dirt, and some hair. This vigorous test, it would appear from the record, if applied in all cases might result in an injury to the hide. It resulted in reclaiming an additional quantity of 3.9 pounds of tare per hide after the examiner had applied his method to the identical hides.

It is pertinent to state that there is testimony in the record to the effect that the commercial test of taring is largely one of estimate applied

to each hide, and it is stated that the average tare is from 3 to 8 pounds of manure to a hide. The testimony further indicates that the tare of hides commercially is confined to the manure or dirt upon them.

On the next shipment, that by the *Ulstermore* April 10, 1909, covered by protest 371111 herein, consisted of two lots. Of the first lot of 409 bundles of hides, 5 were tested by the examiner as the Government test. The same 5 were tested by the importer's representatives. The Government tare was one-fifth of a pound per hide. The importer's representatives removed from them an additional quantity of $4\frac{2}{5}$ pounds per hide.

The second lot of this shipment was 152 bundles of hides. Five were tested. The Government test consisted of two-fifths of a pound tare per hide, while the importer's representatives removed an additional quantity of seven-tenths of a pound, making a total of 1.1 pounds per hide, even under the vigorous test of the importer's representatives.

The Board of General Appraisers held that these tests were not sufficiently representative of total imports of about 16,000 hides and allowed the protests to the extent of the 10 hides actually tared in each case by both the Government and the importer and overruled the protests in all other particulars, as well as the other protests.

It further appears over objection in the record that in response to the request of the collector of customs at Baltimore written but two days after the entry of the cargo of April 10, 1909, the Treasury Department made an investigation at several ports of the methods of determining tare for manure adhering to hides that were imported, from which it determined that 2 pounds per bundle (hide) was a fair general average, and instructed the collector at the port of Baltimore to make such allowance in the future. If it were error to admit this statement it was error without prejudice.

In the case of Seeberger *v.* Wright & Lawther Oil & Lead Manufacturing Co. (157 U. S., 183) the principle as to when tare is allowable is stated in effect that tare should be allowed only in such cases where its presence was uncommon to the condition of the merchandise as ordinarily dealt in in trade and commerce. In other words, the ordinary impurities of merchandise do not constitute tare, but the extraordinary impurities, such as are uncommonly present in the merchandise as bought and sold in trade and commerce, are alone the subject of allowance for dutiable purposes.

It would seem from the testimony in this record and from the recognized practice of the customs officials that the presence of manure in imported hides is a condition uncommon in trade and commerce. Its presence, it appears from the record, is invariably the subject of negotiation in the trade and an allowance made therefor; the reason apparently being, as stated in this record, that "in a very large majority of importations the hides are found to be free from manure, and it is only in rare instances that the question of allowance for manure adhering to the hides is required to be met."

The number of hides which should be examined in the particular case to constitute a fair number upon which to base a practicable average would always be an indefinite question, depending in a great measure in each case upon the character of the property imported as to uniformity and possibly other particulars.

In United States *v.* Thomas (178 Fed. Rep., 602), the importation consisted of wool on the skin. Twenty thousand skins were imported; but eight out of the 20,000 were weighed by the examiner of wool at the port of Boston. It was contended by the Government that this was not a sufficient number from which to ascertain the amount of wool upon the skins. The court held otherwise. In the case at bar, as affects the importations by the *Quernmore* and the *Ulstermore*, it would hardly seem to lie with the Government to assert with reference to these two importations that an insufficient number of skins were taken for the purpose of the test, for the reason that the identical number of skins, in fact the identical skins, and those only, were used as a test by the Government examiner which were used as a test by the representatives of the importer. In the case of the *Quernmore* 10 skins out of 795 were examined, they having been selected by the examiner, after weighing the whole cargo, as representative of the cargo.

In the case of the *Ulstermore* 5 were selected as representative of the 409 skins, and 5 others as representative of the 152 skins, and the identical skins were subjected to the test adopted by the importer. The court is of the opinion that so far as these two cargoes were concerned, in view of this record, a fair number and selection of skins was adopted as a test. It is admitted on all sides that from the same skins where less than 1 pound was recovered by the Government examiner three or four times that amount was recovered by the importer's representatives from the *Quernmore* cargo and about twenty times as much from the 409 skins of the *Ulstermore* cargo and more than twice the quantity from the 152 skins of the *Ulstermore* cargo.

The issuable fact for determination, therefore, is the proper allowance for tare upon these cargoes. The facts from which this determination is to be had are meager and somewhat uncertain. There can be no question, however, that the importer was entitled to a greater allowance for tare than was allowed in the particular cases, and that this record fairly and satisfactorily establishes that fact. In the presence of a similar record, the Supreme Court of the United States in the case of the United States *v.* Ranlett et al. (172 U. S., 133), and where examination was impracticable, the goods having gone into commerce, epitomized the record in the following statement:

A reexamination *de novo* is now impracticable, but it appears to us that the evidence taken by the board affords an adequate basis for a conclusion. The examiner testified that he found "along about 80 to 86 per cent foreign make"; "in general from 75 to 80 per cent"; and that, in his judgment, there was no invoice "that would show over 25 per cent of American bags"; yet he also said that he could not give specific details of each invoice, and that he "supposed if 75 per cent of the bags in the bale were of foreign manufacture, it carried the whole of them."

The Supreme Court, after commenting upon the insufficient character of this evidence and the manifest purpose of the Government officials to faithfully perform their duties under difficult circumstances, stated:

* * * We think it unnecessary to remand the cause for another hearing, and that the ends of justice will be best subserved by directing a decree for the refunding of one-fourth of the duties paid.

We are of the opinion that as to the ·795 bundles, imported per *Quernmore*, and the 409 bundles, imported per *Ulstermore*, the importer was undoubtedly entitled to an allowance for tare of 2 pounds per hide, and such should be made. The evidence showing upon the samples examined of the 152 bundles that the allowance made by the collector was substantially correct, we are of the opinion that no further allowance should be here made as to these bundles.

The decision of the Board of General Appraisers will be accordingly modified, and, as so modified, *affirmed*.

MONTGOMERY, Presiding Judge, and HUNT, SMITH, and BARBER, Judges, concur.