UNITED STATES *v.* CUMMINGS *et al.* (No. 763). CUMMINGS *et al. v.*
UNITED STATES (No. 769).[1]

1. CONSOLIDATION OF HEARINGS.

The several protests were virtually filed by the same party; the questions raised
by these protests and the testimony offered apply alike to all the importations. No
prejudice resulted from the consolidation of the hearings.

2. ALLOWANCE FOR SHORTAGE OF ALE IN CASKS, GENERALLY.

There is no inhibition of allowance for a shortage in ale imports, and it was error
on the part of the collector to ignore the actual shortage in the importation as reported
by the gaugers.

3. DREGS IN ALE.

Dregs and lees in ale are not usable ale, but neither is a foreign impurity.
They are dutiable as a part of the importation.

4. ALLOWANCE HERE.

The question of wantage and the proper allowance for it is essentially one of fact,
and upon the evidence in this case a proper allowance is found to be 3 per cent
of the invoice or standard capacity of the several kinds of cases containing the ale.

## United States Court of Customs Appeals, May 8, 1912.

CROSS-APPEALS from Board of United States General Appraisers, G. A. 7270 (T. D.
31850).

[Modified.]

*William L. Wemple,* Assistant Attorney General, and *Charles E. McNabb,* assistant
attorney, for the United States.

*Comstock & Washburn (Albert H. Washburn* of counsel) for appellee, appellant.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise involved in this case consists of Bass ale, which
was imported in wood under the present tariff act, and was dutiable
at 23 cents per gallon under the appropriate provision of paragraph
308 of the act.

Ten of the importations in question were made at Boston in the
name of W. C. Cummings; 23 were made at New York in the name of
R. J. T. Cooke; and 1 was made at Chicago in the name of the
American Shipping Co. Each assessment was protested by the con-
signee, who conceded the correctness of the assessed rate of duty, but
challenged the collector's findings as to the quantity of the consign-
ment and objected to the regulations prescribed by the department
for the liquidation of such importations.

Upon the application of the protestants, and over the Govern-
ment's objection, the board ordered a consolidation of the several
protests and heard them together upon the same evidence. The
protests were overruled in part and in part sustained. The importers
and the Government severally appeal to this court for a reversal of
that part of the board's decision adverse to the appellant.

___
[1] Reported in T. D. 32576 (22 Treas. Dec., 963).

The first contention of the Government is that the board erred in ordering a consolidation of the different protests, and this assignment of error properly becomes the first subject of the present review.

It appears from the evidence that the ale in question was brewed by the Bass company at Burton-on-Trent, in England, and that the above named consignees at Boston, New York, and Chicago were merely agents for the home company, and received the respective shipments in that capacity. The importations were all made under the same act, and the same issue is made relative to all of them. It does not appear that the consolidation of the protests worked any actual prejudice to the Government, for the entire case was fully presented to the board upon the evidence, as it is now fully presented to the court by the record.

In view, therefore, of the fact that the several protests were virtually filed by the same party, and that the questions raised by them and the testimony relating to them apply alike to all the importations, and that no actual prejudice resulted from the consolidation, the court holds that the board's action in that behalf was not erroneous.

As has been stated, the issue made in this case relates to the action of the collector in finding the quantity of ale composing the importations. There are three Treasury regulations which enter into a discussion of the case, and they are here copied under the numbers which they bear as Treasury Decisions.

(T. D. 6055.)

*Gauging of imported liquors.*

TREASURY DEPARTMENT, *December 5, 1883.*

SIR: This department is in receipt of your letter of the 5th ultimo, relating to the gauging of imported liquors to ascertain the quantity imported, under the recent decision of the Attorney General relating to the assessment of duties on such merchandise.

You state that there is no accurate method of definitely ascertaining the quantity of beer actually received in any shipment, for the reason that if the cask be opened for gauging the liquor will thereby be spoiled.

When necessary, packages containing malt liquors may be gauged for capacity by "outside measurement," the length and also the head and bung diameter being separately measured on the outside of the package, and from the length the thickness of the heads and from the diameter the mean thickness of the bung and bottom staves being deducted. The equivalent of the inside measurements being thus ascertained, the capacity will be calculated, as in ordinary gauging.

When the bung is not removed, the gauger should ascertain the wantage by sounding the line at which the liquor stands in the package, and then computing the capacity of the empty space. The department understands that when the outage of a package of malt liquors is as much as three or four gallons the bung can be safely removed and the package be gauged in the ordinary manner.

You may cause your practice to conform to these views.

Very respectfully,

H. F. FRENCH, *Assistant Secretary.*

SURVEYOR OF CUSTOMS, *Cincinnati, Ohio.*

(T. D. 29929.)

*Imported beer.*

Instructions as to gauging of beer imported in barrels or casks.

TREASURY DEPARTMENT, *August 2, 1909.*

SIR: On and after August 15, 1909, duties will be assessed on beer imported in barrels or casks on the basis of the invoice quantity whenever the same is equal to or exceeds the capacity branded on the barrels or casks in liters. Fractions of a liter will not be considered.

You will keep a record by numbers, in a book provided for that purpose, of the branded capacity of every barrel or cask imported at your port. The returns of branded capacities will be made pursuant to articles 1503 to 1505 of the Customs Regulations of 1908, governing the return of gaugers. When the capacity is not branded on any barrel or cask the same shall be gauged for capacity by outside measurement, the length, head, and bung diameters being separately measured on the outside. From the length the thickness of the heads and from the diameters the mean thickness of the staves should be deducted for inside measurement.

If the total invoice quantity is found to be less than the total branded capacity of all the barrels or casks covered by the invoice, the entry will be liquidated upon the quantity shown by the branded capacity.

The empty barrels or casks when exported should be tested from time to time to ascertain the actual capacity thereof, the gauging being done in the same manner as that governing the gauging under the internal-revenue laws of barrels or casks containing domestic beer.

Department's regulations (T. D. 6055) of December 5, 1883, are hereby modified accordingly.

Respectfully,                                              JAMES B. REYNOLDS,
(57753.)                                                    *Assistant Secretary.*
COLLECTOR OF CUSTOMS, *New York.*

---

(T. D. 30495.)

*Gauging of ale, porter, and stout in kegs, casks, etc.*

T. D. 29929 of August 2, 1909, respecting the gauging of beer, extended to cover ale, porter, and stout imported in kegs, casks, barrels, and similar containers.

TREASURY DEPARTMENT, *April 4, 1910.*

SIR: The instructions of August 2, 1909 (T. D. 29929), respecting the gauging of beer imported in barrels or casks, are hereby made applicable to ale, porter, and stout imported in kegs, casks, barrels, and similar containers.

Respectfully,                                              JAMES F. CURTIS,
(57773.)                                                    *Assistant Secretary.*
COLLECTOR OF CUSTOMS, *New York.*

Bass ale in casks has been continuously imported into this country for more than 30 years last past. A large part of such importations was sold to be bottled in this country for sale here; of this bottling ale probably 93 per cent was sold to the single firm of Thomas McMullen & Co., who were by far the largest distributers of Bass's bottled ale in this country. The residue was sold to dealers and consumers in the usual course of trade.

The casks in which the ale was imported have always been made in six different sizes. The following list gives their trade names and the number of English imperial gallons contained in each, viz,

hogshead, 54 gallons; barrel, 36 gallons; half hogshead, 27 gallons; kilderkin, 18 gallons; firkin, 9 gallons; and pin, 4½ gallons.

One English imperial gallon is equal to 1.20034 American gallons. The fraction thus involved is so nearly equal in value to one-fifth, that in commerce an English gallon is treated as equivalent to one and one-fifth American gallons, and commercial invoices are written by importers upon that basis.

According to that method of conversion the casks above listed contain the following number of American gallons each, viz, hogshead, 64⅘ gallons; barrel, 43⅕ gallons; half hogshead, 32⅖ gallons; kilderkin, 21⅗ gallons; firkin, 10⅘ gallons; and pin, 5⅖ gallons. These figures give the standard capacities of such casks; nevertheless at times there is actually an inconsiderable disparity between different casks of the same nominal capacity.

The importations in question were all entered after the promulgation of T. D. 29929, above copied, and in part after T. D. 30495. The collector acted upon the theory that T. D. 29929 applied to importations of ale as well as beer, although beer alone is specifically named therein. Accordingly, in computing the quantity comprised in the importations the collector considered two factors only; first, the quantity stated in the invoices, and, second, the capacity branded on the casks. The invoice quantity was adopted whenever the same was equal to or exceeded the capacity branded on the casks, and the branded capacity was adopted if it exceeded the invoice quantity.

The present importations were all invoiced to the respective consignees in American gallons at the standard capacity of the respective casks, including the fractions. The casks were all branded in American gallons at even figures, the kilderkins having a fraction added, so as to make the next higher full number, the other casks having the fractions omitted, so as to make the next lower numbers.

In the present liquidations the invoice quantities were adopted for all the casks except the kilderkins, for which the branded capacities were adopted, the quantities thus found exceeding, of course, the aggregate of either the invoice or branded capacities if taken alone. In thus literally following the rule prescribed by T. D. 29929 the collector also ignored the gauger's reports of various shortages resulting from defective casks, and no allowance was made in the liquidation for any of these.

The protests challenged the correctness of this method of liquidation and the board sustained the protests in that behalf.

It seems clear that this ruling of the board was correct. It is designed by the law that the duty of 23 cents per gallon should be collected only upon the actual quantity of the imported ale. In finding that actual quantity a deduction should have been made from the nominal capacities of the casks for any shortage of contents at importation resulting from leakage or other causes. The

proviso of paragraph 307, inhibiting any allowance for leakage on wines, liquors, cordials, or distilled spirits, does not apply to importations of ale.

It is therefore clear that the collector erred when he adopted the full invoice capacity of all the casks except the kilderkins, and adopted the full capacity of the kilderkins with an arbitrary fraction added thereto, and at the same time ignored the actual shortages which were reported by the gaugers. The decision of the board to this effect is approved by the court.

The court therefore next comes to consider the amount of the shortages in the present importations.

The importers include three several elements within their claims for allowance under this head. First, they claim an allowance for any unusual outage ascertained by the gaugers resulting from defective packages. This claim has already been approved by the foregoing statement; second, the importers claim that each cask contains at importation several gallons of dregs and lees which are worthless and should not be held to be dutiable as ale; and, third, they furthermore contend that the casks are not filled bung full at the brewery, and that fermentation continues during the voyage, causing seepage and loss of carbonic-acid gas, even from normal casks, and that owing to these conditions there is an average wantage of contents at importation of several gallons to each cask, even where no special leakage or injury to the cask is apparent.

The importers claim in general that the imported ale is not a ripened stock ale, but is rather a present-use ale, which is poured into the casks at the brewery in a turbid state of incomplete fermentation, within a week or ten days after it is first brewed, and imported within a few weeks after that time. They claim that because of these conditions the casks can not be filled bung full at exportation. They claim also that before importation a pound or more of dry hops is placed in each hogshead, tending to flavor and ripen the ale upon its voyage, in part by continuing the fermentation, and that these hops add to the lees when finally spent. They claim that because of this continuing fermentation the casks can not be tightly coopered when exported, but are necessarily liable to seepage; and that porous pegs are placed in the bungs to permit of the escape of carbonic-acid gas generated within the casks upon the voyage. They claim that Thomas McMullen & Co. have used 150,000 hogsheads of the importation during the last 20 years, and have realized therefrom barely an average of about 57 gallons of bottling ale per hogshead, whereas the nominal capacity of each hogshead was 64¾ gallons; and that because of this experience an allowance of 8 gallons a hogshead has been regularly granted to that firm in its settlements. They claim furthermore that for 30 years preceding the publication of T. D. 29929 there existed a uniform official

practice at New York, Boston, and Chicago, where such importations were received, whereby, because of the foregoing facts, minimum allowances were made to the importers of 3 gallons upon each hogshead, 2 gallons upon each barrel. half hogshead, and kilderkin, and 1 gallon upon each firkin and pin.

The importers submitted testimony before the board tending to prove the foregoing claims.

The Government upon its part denied, in general, the claims for shortage made by the importers, and introduced evidence in contradiction thereof.

The board overruled the importers' claims for an allowance because of dregs and lees, but sustained their claim for a minimum allowance for the alleged wantage of the imported casks.

In respect to the claim for dregs and lees, the decision of the board seems clearly to be correct. It is true that such lees are not usable ale, but neither are they a foreign impurity in the ale. They are really part of the importation, and the assessment was properly imposed upon the ale as an entirety.

In respect to the claim for an average allowance for wantage a more difficult question presents itself. The purpose of the law is to levy the duty of 23 cents per gallon upon the quantity of ale actually imported. In effecting that purpose the Treasury Department may doubtless determine upon tests deemed sufficient that a certain average wantage should be allowed upon such importations, with a view of reaching a true result without detailed tests of individual shipments. But certainly this court can not prescribe any such general rule for the department, nor make a finding designed to control anything more than the importations involved in the case upon trial. Therefore, the sole present question before the court in that behalf is whether or not the importations at bar were entitled to the minimum allowances claimed by the importers and approved by the board.

Upon this subject it may first be said that T. D. 6055 can hardly be cited as an authority for the definite claim of the importers. That regulation did not undertake to fix any rule for allowances, but dealt with the method of gauging containers of beer.

It may furthermore be said that long-continued official practice is not controlling in such a matter as wantage, because the question is essentially one of fact only. If a practice ever existed of arbitrarily allowing an excessive wantage simply as a concession to the importers, tending to relieve them in part of the duty fixed by law, such a practice would be illegal and would never ripen into a right upon the importers' part.

The minimum allowance claimed by the importers and allowed by the board amounts to 20 per cent of the capacity of each pin, 10 per cent of each firkin, 9 per cent of each kilderkin, 6 per cent of each half hogshead, and about $4\frac{1}{2}$ per cent of each barrel and hogshead. The testimony contained in the record does not show any difference

in the percentage of wantage among the different sizes of casks, nor does it seem to support so large a percentage of allowance. It is to be regretted that there is so little proof in the case directed to the particular importations in question; doubtless, however, it was impracticable to secure it, and no presumption arises because of its absence. The testimony relates generally to the manner of packing the ale at the brewery, its continuing fermentation in transit, the amount secured per hogshead for bottling by the McMullen company, the appearance of the casks at importation, and the condition of the ship's hold upon arrival, and all this leads to the belief that the casks were not bung full when they reached port, but it is very indefinite when it comes to fixing the exact amount of the actual wantage.

The customs officials undertook to supply definite proof upon this subject by making actual tests of a number of selected casks from similar importations. Three such tests were made, all in the presence of the consignees.

The first test was made at New York on October 31, 1910. A cask of each of five different sizes was gauged by actually drawing off the contents into measuring vessels. This test failed to find any shortage at all in four of the selected casks; the fifth was found to be defective. The test was not fully satisfactory, and is not cited as authoritative; nevertheless it may be noted that it disclosed no shortage, so far as it went, except in the defective cask.

On December 12, 1910, a second such test was made at New York, again in the presence of the consignee. The hogshead selected for measurement was found to be 3.30 gallons short of its invoice capacity; the half hogshead, 0.55 gallons short; the barrel, 1.70 gallons short; the kilderkin, 1.25 gallons short; the firkin, 1.05 gallons short; and the pin, 0.40 gallons short. This statement assumes that the lees are part of the dutiable contents of the casks, and makes no allowance for them. The total shortage thus computed was $8\frac{1}{4}$ gallons, or about 4.6 per cent of the total invoice capacity of the six examined casks.

A third test was made on January 23–24, 1911, at Boston, in the presence of the consignee. Five several casks were measured, and the total shortage was found to be about 1 gallon, or less than 1 per cent of the capacity of the selected casks.

The consignees objected to these various tests. They complained because so few casks were examined, and claimed that those examined were not of the average appearance and condition of the imported casks. Other complaints were made, which are not now important in view of the opinion already expressed concerning the lees.

Upon a consideration and comparison of all the evidence the court reaches the conclusion that a minimum deduction upon all the imported casks of 3 per cent of their invoice or standard capacities is as great an allowance as should be sustained upon the record, and that

such a deduction should be allowed to the importers as the most practicable method at present of finding the actual contents of the importations in question. This should apply alike to the different kinds of casks containing the importations.

The decision of the board is therefore approved, subject, however, to the foregoing modification; and it is accordingly ordered that reliquidation be made by allowing the importers, first, the special shortages upon individual casks as reported by the gaugers, and, second, an additional 3 per cent deduction from the invoice or standard capacities of all the imported casks as the average wantage thereof in cases where no special shortage was found.

*Modified.*