UNITED STATES *v*. LÜCHOW (No. 1657). LÜCHOW *v*. UNITED STATES (No. 1658).[1]

GAUGE OF BEER—ALLOWANCE FOR WANTAGE OR OUTAGE.

In importations of Wurzburger and Pilsner beer the importer made an honest effort to estimate the amount of wantage or outage, finding 2.96 per cent for the Wurzburger and 3.51 per cent for the Pilsner. By making a justifiable criticism of the importer's method, the Board of United States General Appraisers decided that the proper allowance should be 1 per cent. By giving due weight to the method used and conclusion reached by the manufacturer, corroborative of the method and conclusion of the importer, the court decides that the allowance should be 2 per cent.

---

[1] Reported in T. D. 36869 (31 Treas. Dec., 547).

United States Court of Customs Appeals, December 2, 1916.

CROSS appeals from Board of United States General Appraisers, G. A. 7811 (T. D. 35881).

[Modified.]

*Bert Hanson*, Assistant Attorney General (*Samuel Isenschmid*, special attorney, of counsel), for the United States.

*Comstock & Washburn* (*Albert H. Washburn* of counsel) for the importer.

[Oral argument Oct. 12 and 13, 1916, by Mr. Hanson and Mr. Washburn.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court·

These are cross appeals from a decree of the Board of General Appraisers, G. A. 7811 (T. D. 35881).

The merchandise is beer in half-barrel casks, dutiable at 23 cents a gallon. No question arises over classification, the protest being confined to the claim that the amount of duty assessed is excessive by reason of the failure of the collector to make allowance for wantage or outage.

Prior to August 2, 1909, a Treasury regulation (T. D. 6055), promulgated August 5, 1883, provided for ascertaining the quantity of beer in any shipment by outside measurement, the wantage to be ascertained by sounding out the line at which the liquor stood in the package, and then computing the capacity of the empty space. That regulation was based upon information that the removal of the bung would cause the beer to spoil. After this regulation was promulgated, and prior to August 2, 1909, improved methods of manufacture and treatment of beer were adopted, so that, at least as to fully matured beer, it became possible to fill the cask substantially bung full if the beer was reduced to the proper temperature. Evidently in view of this fact, and doubtless based upon such information as came to the department from investigation, an order was, on the date last named, issued to assess beer at invoice quantity whenever it was equal to or exceeded the branded capacity, and when the invoice quantity was less than the branded capacity to assess for full branded capacity less fractions of liters. The report upon which this order was based, in part at least, was made by Frederick Achenbach, confidential agent of the Treasury. The importer not being satisfied with this ruling sought to show that in practice shipments of beer and ale, respectively, which reach our ports for importation are substantially less than the branded capacity, at least in the case of individual importers.

This contention was put forth in United States *v.* Cummings (3 Ct. Cust. Appls., 291; T. D. 32576) as to ale (the Treasury regulation of August 2, 1909, having been by a subsequent Treasury order made applicable to ale). In that case, upon the proofs adduced, we

directed an allowance for wantage of 3 per cent. The case of Hollender *v.* United States (4 Ct. Cust. Appls., 406; T. D. 33850) followed. That case related to beer. The question of fact was gone into at length and the importer sought to show the wantage by measurements made in bottling the beer and showing that the amount of beer as it appeared to be in bottles was less than the branded capacity of the casks from which the beer was bottled. Both the Board of General Appraisers and this court reached the conclusion upon the record as there made up that there was so much uncertainty as to the accuracy of the method employed that it was impossible to base a conclusion upon which we could rest our judgment in an allowance for the wantage. In that case the report of Achenbach was received in evidence, and it appeared from that report that he had visited substantially all the breweries in which beer was made and witnessed the process of filling the barrels, and that the whole barrel was filled with beer without froth and the only vacant space left was the bunghole, and that a workman with a hammer quickly drove a bung into this vacant space, so that the bunged-up barrel is entirely full of beer. Notwithstanding this, it appeared in the case that some of the barrels imported were inspected for shortage by the importer, the steamship company, and the customs gauger, and it was assumed that no unfilled barrel escaped. The testimony in the Hollender case is introduced as a part of the record in the present case and additional testimony is taken.

In this report of Mr. Achenbach, which was in evidence in the former case and also in this, it is stated:

I frankly told a number of the most intelligent brewers the purpose of my inquiry, stating it had been planned to weigh the cask upon its arrival in the United States and then by subtracting the weight of the empty cask, determine the weight of the liquid contents, for knowing the weight per liter or per gallon of the beer in question, it would be easy to establish the number of liters or gallons in the barrel with mathematical accuracy. I asked the brewers if they could suggest a better or a fairer method. They replied without exception that the proposed method was just and that they could suggest none that would be more equitable.

The importer in the present case made an attempt to follow out this method of ascertaining the wantage. The testimony on the part of the importer is to the effect that barrels were selected which were not damaged in any way, and that by introducing a siphon, the beer was siphoned out completely and weighed. The casks were then weighed, and by this method the wantage was ascertained. It certainly ought to be open to the importer to offer the best proof that can be reasonably secured to show what the fact is in any given case. If as a matter of fact the beer imported was less than that assessed for, he is entitled to relief, and in determining this question, while strict proof should be required, a rule ought not to be adopted

which in effect amounts to a denial of remedy. We have no doubt, nor apparently had the Board of General Appraisers any doubt, as to the credibility of the witnesses in this case.

There is a question which will be referred to later on as to whether the figures of wantage are too high. But first let us refer to the position which was taken by the Government in the Hollender case, and which had some weight in the determination of the question of fact. As will be noted, in that case the testimony of the confidential agent was offered in the form of a report to the Treasury Department. His credibility was in no way attacked nor is it now attacked. But his opportunities for observation are made the subject of comment by the importer's counsel, and very properly. The report indicates that he witnessed the filling of barrels in all the breweries to which his report related. In his testimony on this trial he says:

I notice in my report I said " all," but that is too far back for me to answer now.

He further testified:

Q. Nor can you tell us in how many breweries you saw these casks or barrels being filled at this time?—A. Yes; I can answer that. I saw it in at least the majority of the breweries named on page 92.

Q. Tell us which ones of those?—A. I can not do that.

Q. How can you say it was the majority, then?—A. According to my present recollection I saw the process of filling in nearly all of them. There may have been two or three I did not see it in, but it may have been all. I don't remember, this is so long back, I can not make a statement positively. I looked at enough to satisfy me on that point.

On redirect examination he was asked:

Q. You correctly stated at that time (the date of the report) the circumstances that you were reporting about?—A. Barring clerical errors. I was under big pressure of work at that time. Except I will modify my report in this way: I think that I said there was beer being filled in all the breweries I visited. My recollection is not clear enough on that. It was nearly all instead of all. I want to put that in because it is the truth.

This variation would not be so important except for the fact that even in cases in which the witness saw the filling of the casks going on it is not made clear by this record that these casks were casks of beer for exportation. On the contrary, so far as the shipments from cne brewery are concerned, the testimony tends very strongly to show the reverse.

The importer in this case produced Dr. Vogel, the vice president of the Pilsner Genossenschafts Brauerie, of Pilsen, who testified to his recollection of the fact of the visit of Mr. Achenbach to the brewery, and that he was able to fix the date, and at that time they were engaged in filling beer for domestic or continental consumption and not for export to the United States.

The testimony in this case also discloses that beer prepared for exportation to the United States differs from fully matured beer, in this important particular: The beer for home consumption is left in the reservoir for the purpose of fermentation three and a half to four months, whereas beer which is destined for export to the United States is imperfectly matured, because it remains in the reservoir not more than two months, and that when the export beer is being barreled, a substance called krausen is added to the beer. This krausen is beer in its first stage, namely, in the second or third day of fermentation. When the beer for exportation is barreled, first a quantity of this krausen is put in and then the additional beer two months matured is introduced and the result is that the carbonic acid which is liberated increases the volume of the liquid in the barrel so that, according to the testimony of Dr. Vogel, it is impossible to fill the barrel bung full. There is nothing to throw discredit upon the testimony of this witness, nor is there anything to throw discredit upon the witnesses for the importer who made the tests upon which the importer relies. By these tests, the percentage of outage which was wanting in the importations of the Wurzburger beer was 2.96 per cent and the percentage of wantage in the Pilsner beer was 3.51 per cent.

The method by which the wantage was ascertained by the witnesses for the importer is criticized. This method consisted, as stated, of attempting to draw out from the cask all the beer, and in doing so, with the barrel resting on one end, a tube was introduced at the bung of the other end, and by suction all the contents of the barrel were said to be removed. The testimony of the operator shows the process, and it is corroborated by the testimony of the superintendent of the bottling works, to the effect that after the beer was removed the barrel was examined and found to be empty, in some instances by introducing an electric light and in other instances by turning the barrel on end and finding it empty. But it appeared in the course of the examination of the operator that this tube, which was introduced into the barrel and rested upon the bottom, had a conical point, and that near the point of the tube were three holes into which the contents of the barrel were sucked and brought up. He testified as follows:

Q. Is it not possible that some of the sediment remains in the barrel? You can not put the sucking tube right down to the bottom of the barrel, otherwise you would not get any suction.—A. Oh, yes. There are holes on the end of this tube, a little bit above, a little bit raised. They are not on the very end, they are on the side of the pipe.

Q. How much are they raised from the end?—A. Probably a quarter of an inch.

44123—VOL 7—17——20

Q. Probably a quarter of an inch? Then there is a quarter of an inch of beer and sediment or whatever it may be in the bottom of the barrel that you can not get out?—A. No, sir; it is sucked out.

Q. The end of this tube is closed up?—A. The end of the tube is closed up.

Q. There are holes through which the beer is sucked up a quarter of an inch from the end?—A. I never measured it. Probably half an inch, probably less.

Q. Is it not true that if you put that pipe down all the way to the bottom of the barrels, and the holes being a quarter of an inch from the end, you can not suck anything out of that barrel that is below that quarter of an inch?—A. No, sir; you can suck it all out, to the very last drop, if the barrel stands perpendicular. I mean straight up and down.

The board concluded that the witness was mistaken in supposing that this material could all be sucked out and that a deduction should be made on account of this fact of 1¼ pints, which would represent 1 per cent of the total capacity. We think this reduction from the claimed shortage was justifiable, but the board, we think, was in error in assuming that but for this allowance of 1 per cent the total allowance would be limited to 2 per cent. As the net allowance permitted by the board was 1 per cent, as the record shows, according to measurements of the witness Miller and the computation made by the accountant, the demonstrated outage of the Wurzburger is 2.96 per cent and the Pillsner 3.51 per cent, or an average outage of 3.23+ per cent of the beer in suit. So, if from these figures a deduction of 1 per cent is made, the allowance would, if based solely upon these figures, amount to something over 2 per cent.

But there is another item of testimony in the case which is not to be overlooked, and that is the testimony of the witness Dr. Vogel of tests made abroad of this beer which was shipped to the importer. He testified that a claim was made by the importer for an allowance for wantage, and that he replied that such allowance could not be made until he had returned to his home and made tests, or, as he puts it, "I said we must prove it again and again in the brewery." These tests were made, and it appears that an allowance of 2 per cent from the invoice quantity in addition to the fractions of liters, which were ignored, was made, and that the rebate of 2 per cent was based upon the brewery's calculation or estimate of the difference between the invoice quantity and the actual quantity of beer in the barrel. He was asked how he determined that it was just 2 per cent. He answered:

We have found this by drawing the contents of the barrel and by measuring it then. Then we have also opened full barrels again and have permitted all the carbonic acid gas to escape, and then filled up the barrel again with liquid, and the amount which we filled into those barrels represented this rebate which we give to Mr. Lüchow.

This testimony, while corroborative of the testimony as to the importer's tests, should also be deemed as tending to limit the amount of allowance which should be made, and upon the whole case we think

that it is established by fairly satisfactory evidence that upon the importation here in question there should be an allowance of 2 per cent on the importations.

The decision of the board will be *modified* accordingly.