(C.D. 2249)

Esso Standard Oil Co. *v.* United States

United States Customs Court, Third Division

(Decided April 10, 1961)

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* and *Howard Clare Carter* of counsel) for the plaintiff.

*William H. Orrick, Jr.,* Assistant Attorney General ·(*Sheila N. Ziff,* trial attorney), for the defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges

JOHNSON, Judge: The merchandise involved in these cases, consolidated at the trial, consists of crude oil imported from Venezuela in December 1956 and June 1957. It was assessed with internal revenue tax under section 4521 (formerly section 3422) of the Internal Revenue Code, as modified by the trade agreement with Venezuela, T.D. 53107, at ⅛ cent or ¼ cent per gallon, depending upon the A.P.I. gravity of the shipment. Neither the collector's classification of the merchandise as crude petroleum nor the rate of tax is challenged, but it is claimed that the tax was assessed on too great a quantity of merchandise; that it should have been assessed only upon the quantity actually imported; and that allowance should have been made for all bottom sediment and water found in or upon such merchandise.

The pertinent provisions of the Tariff Act of 1930 are as follows:

SEC. 315. EFFECTIVE DATES OF RATES OF DUTY [as amended by the Customs Administrative Act of 1938 and the Customs Simplification Act of 1953].

\*    \*    \*    \*    \*    \*    \*

(c) Insofar as duties are based upon the quantity of any merchandise, such duties shall, except as provided in paragraph 813 and section 562 of this Act (relating respectively to certain beverages and to manipulating warehouses), be levied and collected upon the quantity of such merchandise at the time of its importation.

SEC. 507. TARE AND DRAFT.

The Secretary of the Treasury is hereby authorized to prescribe and issue regulations for the ascertainment of tare upon imported merchandise, including the establishment of reasonable and just schedule tares therefor, but in no case shall there be any allowance for draft or for impurities, other than excessive moisture and impurities not usually found in or upon such or similar merchandise.

Section 15.7 of the Customs Regulations, issued pursuant to section 507, *supra,* reads as follows:

(a)   Application for an allowance for excessive moisture or other impurities under section 507, Tariff Act of 1930, shall be made on customs Form 4317 and filed with the collector of customs within 10 days after the report of weight has been received by him.

(b) The collector shall cause such investigation to be made as may be necessary to determine whether or not the merchandise contains excessive moisture or other impurities not usually found in or upon such or similar merchandise, together with the amount thereof, and, if necessary, may refer the application to the appraiser for such determination.

(c) If the collector is satisfied from the reports received that the claim is valid, due allowance shall be made in the liquidation of the entry. (Sec. 507, 46 Stat. 732; 19 U.S.C. 1507.)

At the trial, the entry papers and reports and documents included therewith were received in evidence, and it was stipulated that the amount of bottom sediment and water and the amount of imported crude petroleum, including the bottom sediment and water, were as shown on the laboratory reports and the weigher's returns. Said reports show the amount of bottom sediment and water in the merchandise covered by protest No. 59/1707 as 1.1 per centum and that in the merchandise covered by protest No. 59/2082 as 0.9 per centum. The regulations were complied with by the importer, and an allowance for bottom sediment and water in excess of 1 per centum was made in liquidating the entry covered by protest No. 59/1707. No allowance was made in connection with the other entry, since the bottom sediment and water were found to be less than 1 per centum. These actions were taken in accordance with a decision of the Bureau of Customs, reading as follows (69 Treas. Dec. 466, 467, T.D. 48204):

(5) *Crude petroleum.*—Bottom sediment and water in excess of 1 percent in importations of crude petroleum and fuel oil would be considered excessive within the purview of section 507 of the Tariff Act of 1930. In view thereof, where the importer complies with the requirements of article 813 of the Customs Regulations of 1931, allowance should be made in liquidation of such entries for water and sediment in excess of 1 percent.

Lynn J. Myers, a chemical engineer in the employ of the plaintiff company, testified that he has been familiar with bottom sediment and water since 1931 and described it as follows:

Bottom sediment and water is, as the name describes, is a solid—sediment is a solid material, mostly earthy matter which occurs in crude oil because it comes out of the ground; and water, of course, is water, and may, at times, have salt in it, certain salts which also occur because it comes out of the ground, where water can get into the oil. In addition to that, additional water may be picked up by crude oil in its transportation, because it may be pumped into tanks which might have a little water accumulated in them because of condensation, or possibly rain water, or because it may be transported in ships which may have small leaks and let sea water in. Bottom sediment and water certainly is not petroleum. * * *

The witness explained that if bottom sediment is not removed, the petroleum is unsalable, since the purchasers of petroleum do not want earthy matter in the products they buy, and that water presents a problem because of its adverse effect on the operation of stills used to distill petroleum. He also pointed out that attempts are made to remove bottom sediment and water from crude petroleum as it is being taken from the oilfield to the refinery. He stated that, when crude oil is allowed to remain in a storage tank for some time, the bottom sediment and water has an opportunity to settle out because of its higher

specific gravity and that the tanks are usually equipped with so-called cone bottoms from which the material which has been settled out may be pumped away and separated from the oil.

The witness described the centrifuge test which is used throughout the petroleum industry to determine the amount or percentage of bottom sediment and water in crude oil. While this test physically separates the petroleum from bottom sediment and water, small amounts of both water and sediment may be left in the oil because of certain chemical affinities between the oil and the water and sediment.

Mr. Myers testified that he had tested crude petroleum immediately upon importation, although not often, and that in almost every case bottom sediment and water were present. This was also true when tests were performed on crude oil which had been in storage.

Calvin H. Beal, a chemical engineer employed by the Creole Petroleum Corp., testified that he had observed every phase of the handling of crude oil by his company in Venezuela and that a number of steps were taken to separate bottom sediment and water from crude oil. He said that the longer the oil stays in tanks, the more water settles out and that before the oil is either moved to a processing unit or to a vessel for exportation, the water is drawn out.

The witness stated that he was familiar with the centrifuge test and that it was routine operating procedure to run such a test on crude oil which is shipped by his company from Venezuela. Such tests are made between the receipt of the oil through the pipeline and the shipment thereof. Records of the tests made on the merchandise involved herein were received in evidence as plaintiff's exhibits 3 and 4. They indicate an amount of bottom sediment and water lower than that determined by the United States Customs Laboratory.

Charles Stoehrmann, section head of the traffic division of Esso Export Corp., testified that the documents received by his department on a shipment of oil indicate the amount of the bottom sediment and water inherent in the shipment, but that the customer is always billed upon the net amount after the percentage of bottom sediment and water has been subtracted from the gross. He said that, in most cases, bottom sediment and water are present in the oil so that an allowance is made in nearly every shipment.

Joseph Rice, assistant vice president of Esso Export Corp., Earl Whatley, manager of crude petroleum sales and supply of Socony Mobil Oil Co., and Herbert Ekloff, crew coordinator of Esso Standard, Division of Humble Oil and Refining Co., each testified that purchasers are never charged for bottom sediment and water but are billed on the net gallonage.

It was then stipulated by counsel that:

* * * it is, and has been for at least the past 20 years, the practice in the oil industry, both in the United States, and elsewhere, to charge only for crude petroleum, after a deduction has been made for bottom sediment and water, as determined in a centrifuge test.

Plaintiff claims in the alternative (1) that, in view of section 315 (c), *supra*, the collector should have levied tax only upon the actual number of gallons of crude petroleum imported, and not on the bottom sediment and water, or (2) that an allowance for the entire amount of bottom sediment and water should have been made under section 507, *supra*.

It is well settled that section 315(c), *supra*, which provides that duties shall be levied upon the quantity of merchandise at the time of its importation, must be read in the light of section 507, which clearly imposes a duty upon moisture and impurities usually found in or upon such or similar merchandise and permits an allowance only as to excessive impurities. *Socony Vacum Oil Co., Inc.* v. *United States*, 44 C.C.P.A. (Customs) 83, C.A.D. 641; *Cargill Grain Co., Inc.* v. *United States*, 30 C.C.P.A. (Customs) 78, C.A.D. 219; *N. M. Albert & Company et al.* v. *United States*, 36 Cust. Ct. 294, C.D. 1789.

Plaintiff claims, however, that section 507 authorizes the Secretary of the Treasury only to issue regulations for the determination of *tare*; that the prohibition against allowance for impurities is limited to such allowance when made as a tare allowance in determining the weight of merchandise; and that it has no application where the merchandise is subject to duty or tax upon its volume rather than its weight.

While the term "tare" is generally defined as a deduction from the gross weight made in order to ascertain the net weight of the goods *per se*, this term has a broader meaning in tariff statutes and has been held to include impurities not ordinarily present in merchandise. *Socony Vacuum Oil Co., Inc.* v. *United States, supra*; *Shallus* v. *United States*, 1 Ct. Cust. Appls. 316, T.D. 31408; *United States* v. *Baker Castor Oil Co.*, 2 Ct. Cust. Appls. 338, T.D. 32076; *Frame & Co.* v. *United States*, 46 Treas. Dec. 355, T.D. 40476. Section 507 has been interpreted as permitting the Secretary of the Treasury to prescribe regulations not only for the ascertainment of tare but also for the determination of allowances for excessive impurities. *Frame & Co.* v. *United States, supra*; *Socony Vacuum Oil Co., Inc.* v. *United States, supra*. Since tare has been construed for tariff purposes as including extraordinary impurities, and since impurities may exist in merchandise, whether or not such merchandise is subject to duty or tax on the basis of weight, it seems clear that the prohibition in section 507 of allowances for ordinary impurities and the direction for

allowance for excessive moisture and impurities were not intended to be limited to merchandise dutiable by weight.

The cases cited by plaintiff for the proposition that deductions may be made on worthless material accompanying an imported commodity are not in point. Those cases involved material which had been deliberately added as a packing or preserving agent, which was discarded after importation by the consumer. *Peabody & Co.* v. *United States*, 13 Ct. Cust. Appls. 80, T.D. 40935; *Von Bremen, Asche & Co.* v. *United States*, 57 Treas. Dec. 679, T.D. 44000; *Wa Chong Co.* v. *United States*, 61 Treas. Dec. 1118, T.D. 45695; *Von Bremen, Asche, De Bruyn, Inc.* v. *United States*, 64 Treas. Dec. 269, T.D. 46643; *Mattia Locatelli New York Branch* v. *United States*, 69 Treas. Dec. 750, T.D. 48284; *Lakeside Fish & Oyster Co.* v. *United States*, 69 Treas. Dec. 803, T.D. 48301; *Enbun Co.* v. *United States*, 73 Treas. Dec. 192, T.D. 49388; *H. K. Wheeler, Inc.* v. *United States*, 9 Cust. Ct. 30, C.D. 655.

In the *Peabody* case, the court stated (p. 81) :

From the evidence it is evident that the water in which the fruit is packed is not a commercial commodity and is simply used to sterilize the fruit and to maintain its form in the tins. * * * *Water absorbed by the pineapples or condensed thereon by natural processes might well be considered as a part thereof*, but water placed in tins with the fruit for the sole purpose of protecting it from damage is not, in the trade, use, or fact, either a part or a natural impurity thereof. [Italics supplied.]

In *United States* v. *Cummings*, 3 Ct. Cust. Appls. 291, T.D. 32576, the issue involved the dutiable quantity of ale, and it was held, among other things, that no allowance could be made for dregs or lees, the court stating (p. 296) :

* * * It is true that such lees are not usable ale, but neither are they a foreign impurity in the ale. They are really part of the importation, and the assessment was properly imposed upon the ale as an entirety.

*Rosenstein Bros.* v. *United States*, 4 Ct. Cust. Appls. 401, T.D. 33840, involved herring imported in tins, the question being whether the weight of certain liquid in the tins should be deducted in the assessment of duty. It appeared that the liquid was not an added liquid, but an oil which, under the process and pressure of canning, exuded from the fish and took up the salt into solution, forming a brine. The court denied an allowance, stating (pp. 402–403) :

The case here at issue differs from a line of decisions promulgated by the Board of General Appraisers, such as in G.A. 5717 (T.D. 25409), wherein an allowance was made for quantities of brine added to fish in barrels as a preservative more or less in quantity sufficient to cover the fish. In that case the foreign material was added. This content is in effect a part of the fish. If allowance were sustained for the oil expressed from the fish, upon the ground claimed by appellant that it was useless and thrown away, we might well expect

this case to be followed by claims for the heads, tails, fins, and bones of the fish, which likewise are not used and are thrown away.

\*　　\*　　\*　　\*　　\*　　\*　　\*

We agree with the board "that we should not grant the demand for liquid usually found in the commodity and which has been produced entirely from the commodity itself after being packed."

In the instant case, the bottom sediment and water are not foreign substances which have been added to the crude petroleum but are natural impurities usually found in crude petroleum. Section 507 was designed to embrace just this situation and to provide for allowances for impurities in excess of the amount usually found in or upon this type of merchandise.

The question remaining is whether the importer is entitled to a full allowance for all the bottom sediment and water in the petroleum rather than an allowance only for the quantity in excess of 1 per centum.

According to the testimony at the trial, in almost all instances where a test of crude petroleum was made, a quantity of bottom sediment and water was found. However, it appears from the evidence and the stipulation that it is and has been the practice in the trade to charge customers only for the net amount of crude petroleum after deducting a percentage for bottom sediment and water, as determined by a centrifuge test. Plaintiff claims that any measurable amount of bottom sediment and water in crude petroleum is regarded as excessive by the trade and that, therefore, full allowance should be made under section 507 for all measurable quantities.

The courts have stated that, in order for a plaintiff to recover under section 507, or its predecessors, he must establish the percentage of impurities in the shipment over and above the amount usually found in or upon such or similar merchandise as bought and sold in the trade, and show that, at the time of the passage of the tariff act, it was the general, uniform, and definite custom of the trade not to regard such unusual impurities as part of the goods and to make allowances therefor. *Wood & Selick* v. *United States*, 4 Ct. Cust. Appls. 228, T.D. 33439; *Robert Werk & Co.* v. *United States*, 57 Treas. Dec. 403, T.D. 43904; *N. M. Albert & Company et al.* v. *United States, supra.*

In the instant case, it appears that measurable quantities of bottom sediment and water are, in fact, usually found in or upon such or similar merchandise but that it is the custom of the trade not to regard such quantities as part of the goods and to make allowances therefor.

None of the cases cited involved precisely this situation. It seems clear, however, that the purpose of the statute is to permit allowances only for quantities of impurities which are, in fact, greater than those usually found in or upon such or similar merchandise, and not to permit an allowance for ordinary impurities because of a trade practice.

Under the statute as written, an allowance for any impurity is an exception. An exception which carves out of a statute something ordinarily included within its purview must be strictly construed. *Goat and Sheepskin Import Co. et al.* v. *United States*, 5 Ct. Cust. Appls. 178, T.D. 34254; *Joleo Impex Co.* v. *United States*, 45 Cust. Ct. 6, C.D. 2189. While, in many instances, a trade practice may constitute evidence of the quantity of impurities usually found in or upon such or similar merchandise, the record in the present case establishes that a measurable quantity of bottom sediment and water is, in fact, usually found in crude petroleum. A trade practice under which such quantity is ignored in billing the customer cannot controvert the fact that such quantity normally exists and apparently is inherent in crude petroleum. Under the terms of the statute, no allowance can be made for impurities which usually are present in such or similar merchandise.

Had plaintiff shown that the quantity of impurities usually found in crude petroleum was less than 1 per centum, an allowance for an excess over and above such usual quantity could have been made. Since plaintiff has presented no evidence refuting the collector's finding that 1 per centum is the usual quantity of bottom sediment and water actually present in crude petroleum, the collector's action in making allowance only for quantities in excess of 1 per centum is affirmed.

For the reasons stated, the protests are overruled. Judgment will be rendered accordingly.